-   For Publication   -

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **CRYSTAL ARNOLD,**<br>              **Plaintiff,** | **CIVIL ACTION** |
| **v.** | |
| **THE CITY OF PHILADELPHIA,**<br>              **Defendant.** | **NO.  14-2598** |

## OPINION

The case arises out of an encounter in 2011 between Plaintiff Crystal Arnold (née Snider) and Philadelphia police officers in which Arnold was taken into custody and later released, and after which Plaintiff was abducted and raped by an unknown third party.  Plaintiff brings this action against Police Officer Joseph Guinan ("Guinan") and Police Officer Nicole Enggasser[1] ("Enggasser") (collectively, "the officers"), alleging claims under 42 U.S.C. § 1983 for state-created danger, which violated her Fourteenth Amendment rights, and state law claims for negligence and intentional infliction of emotional distress ("IIED").  Plaintiff also sues the City of Philadelphia ("the City"), asserting a claim under *Monell v. City of N.Y. Dept. of Social Servs.*, 436 U.S. 658 (1978).  Before the Court is defendants' motion for summary judgment as to each of Arnold's claims.  For the reasons discussed herein, summary judgment is granted in part and denied in part.

### I.    FACTUAL BACKGROUND

On the evening of August 19, 2011, Plaintiff Crystal Arnold left work at the end of her shift and went to a bar to celebrate a co-worker's birthday.  *See* Joint Appendix ("JA") 29;

---

[1] Since the incident in 2011, Nicole Enggasser married co-defendant Joseph Guinan and legally changed her name to Nicole Guinan. However, due to the frequent use of the name Enggasser in documents and witness statements, the Court will refer to her as Nicole Enggasser for convenience.

Defendants' Statement of Undisputed Material Facts ("Def. Facts") ¶ 1; Plaintiff's Statement of
Disputed Material Facts ("Pl. Facts") ¶ 1.  An hour later, Arnold and a friend proceeded to a
second bar, where they stayed until it closed around 2:00 a.m..  JA 31.  Arnold testified at her
deposition that she did not recall how many alcoholic drinks she consumed over the course of the
evening, but estimated that it was probably more than five.  *Id.*; Def. Facts ¶ 2; Pl. Facts ¶ 2.
That same evening, Philadelphia Police Officers Enggasser and Guinan were on patrol out of the
24th police district headquarters.  JA 121, 203.

When Arnold arrived home, she dropped her clutch purse on the ground.  JA 31-33; Def.
Facts ¶ 5; Pl. Facts ¶ 5.  Two teenagers on bicycles rode up to her, grabbed the purse containing
Arnold's debit card, identification, cell phone, keys, and money, and fled across the street where
about twenty people were gathered.  *Id.*  Arnold followed the teens into the street and yelled
toward the house that she wanted her things back; she then began arguing with a woman.  JA 31;
Def. Facts ¶ 6; Pl. Facts ¶ 6.  When Arnold continued to demand the return of her belongings,
another woman exited the house and struck her.  JA 31.  When she tried to defend herself,
Arnold was kicked and hit repeatedly by several individuals.  JA 31, 35, 623-24, 626; Def. Facts
¶ 8; Pl. Facts ¶ 8.

Defendants responded to a radio call of a person screaming at Arnold's location and
arrived on scene at approximately 2:50 a.m..  JA 35, 623; Def. Facts ¶¶ 9-10; Pl. Facts ¶¶ 9-10.
Officer Enggasser observed that Arnold appeared to have been in a fight and that her face was
bleeding.  JA 205, 209; Def. Facts ¶ 11; Pl. Facts ¶ 11.  When defendants ordered her to disperse,
Arnold cursed at the officers and threw one of her shoes at the police vehicle.  JA 31, 205-07,
212.  Arnold's belligerence, use of profanity, and failure to follow simple commands led Officers
Enggasser and Guinan to conclude that Arnold was highly intoxicated.  JA 144, 209.  When

2

Arnold spat on the ground in the officers' direction, they arrested her, placed her in handcuffs, and secured her inside the patrol vehicle. JA 213-15; Def. Facts ¶ 14; Pl. Facts ¶ 14.  Neither Officer Enggasser nor Officer Guinan offered Arnold medical assistance while she was in custody. JA 220-21.  Defendants later issued Arnold a citation for public intoxication. JA 224, 623-25.

Here, the parties' narratives diverge: Arnold maintains that she was "made to get out" of the police vehicle on Kensington Avenue; Defendants assert that she was taken to the police station and released after being informed that there were pay phones available. JA 31, 135, 205, 219-20; Def. Facts ¶¶ 17, 20; Pl. Facts ¶¶ 17, 20.[2]  Philadelphia Police Department Directive #128 states that, before an intoxicated person may be released from custody, a friend or relative must be contacted to accept responsibility for escorting her home; if next of kin is unavailable, the individual should be "housed in the respective district/division of arrest" until she has regained full control of her faculties. JA 629-30; Def. Facts ¶ 19; Pl. Facts ¶ 19.  Sergeant Alfred Corson ("Corson"), the officers' supervisor at the time, testified at his deposition that it is improper police procedure to release an intoxicated person without first contacting a family member. JA 304-05.  Sergeant Rafael Ali ("Ali"), a corporal in the 24th district at the time of Arnold's arrest, testified that if a person in custody is injured, officers must take that individual to a hospital for treatment and fill out a separate form. JA 357-58.  It is uncontested that Arnold ended up alone, shoeless, without her purse, wallet, or phone, while intoxicated, over a mile away from her home. JA 32, 144, 219-20; Def. Facts ¶¶ 5, 16, 18 , 21; Pl. Facts ¶¶ 5, 16, 18, 21.

Nonetheless, Officer Enggasser was unconcerned that Arnold departed without assistance. JA 221, 226.  At her deposition, Officer Enggasser testified to the following:

---

[2] For reasons discussed *infra*, the location at which Arnold was released from custody is not a material fact. *See Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006) ("[a] fact is material if it might affect the outcome of the suit under the governing substantive law").

3

Q:      Have you had situations where you have become aware in the years you've been a
        police officer that people who are intoxicated, that they can end up sustaining
        various types of injury on the streets, have you seen that happen?

A:      Yeah, I've seen that happen.  (JA 226)

                                        . . .

Q:      . . . Back at the time when you let [Arnold] had go [sic] and you saw her walk off
        into the darkness, you didn't know where she was going to go; right?

A:      She was an adult. (JA 221)

Officer Guinan testified similarly at his deposition:

Q:      And others who see you in an intoxicated condition, who are bad guys, you
        become more vulnerable, don't you, if you're intoxicated; right?

A:      You could. (JA 147)

                                        . . .

Q:      Did you think about that time . . . this could create a risk to [Arnold], this is a
        risky situation for her, did that thought cross your mind when you watched her
        walk away that night?

A:      Not really. (JA 146)

The officers further testified that they was aware of Philadelphia Police directives that

mandate all adult females charged with intoxication be transported to the Police Detention Unit

("PDU"), and that all prisoners in the PDU with injuries must receive medical treatment.  JA

145-46, 233-35.  Both officers conceded that they failed to comply with such directives.  *Id.*

After her release from custody, Arnold "blacked out" and found herself walking on

Kensington Avenue.  JA 31-32; Def. Facts ¶ 22; Pl. Facts ¶ 22.  Arnold "blacked out" again a

short time later and awoke in a strange home, bent over a couch, with an unfamiliar man.  JA 32.

When she grew alarmed and began to scream, the man took Arnold to his vehicle where she

"blacked out" for a third time.  JA 32, 39.  Arnold later awoke in an outdoor, gravel area where

she was raped by the unknown man.  JA 32; Def. Facts ¶ 25; Pl. Facts ¶ 25.  When the individual

finished sexually assaulting her, he left the scene.  JA 32.  Arnold was found by police a short

distance away from the scene and taken to a nearby hospital for treatment.  JA 32, 40; Def. Facts

¶ 26; Pl. Facts ¶ 26.

Police Officer Tomekia Terry ("Terry") of the Special Victims Unit interviewed Arnold regarding the rape and gave her a copy of the citation that Officers Enggasser and Guinan had issued earlier that evening.  JA 40, 47.  At her deposition, Officer Terry could not recall the results of the sexual assault kit collected at the hospital; she did not know what happened to the evidence collected from the scene of the rape because she did not generate a property receipt for it.  JA 406, 411, 415.

## II.    LEGAL STANDARD

Summary judgment, pursuant to Federal Rule of Civil Procedure 56(a), "is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Alabama v. North Carolina*, 560 U.S. 330, 345 (2010) (citations and internal quotation marks omitted).  "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original).  "A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-26 (1986); *Anderson*, 477 U.S. at 248-52).

The reviewing court should view the facts in the light most favorable to the non-moving party and "draw all reasonable inferences in that party's favor." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013).  However, "the non-moving party must present more than a mere scintilla of evidence; 'there must be evidence on which the jury could reasonably find for the

[non-movant].'" *Jakimas v. Hoffmann-LaRoche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007) (citing *Anderson*, 477 U.S. at 252).

## III.   DISCUSSION

### A.   Section 1983 "State-Created Danger"

#### 1.   *Prima Facie Case*

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that a person acting under color of state law engaged in conduct that violated a right protected by the Constitution or laws of the United States. *See Morrow v. Balaski*, 719 F.3d 160, 165-66 (3d Cir. 2013). Arnold's Section 1983 claim rests on the Due Process Clause of the Fourteenth Amendment, which provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. Arnold alleges that defendants violated her constitutional protection against arbitrary governmental action by creating a dangerous condition that was directly responsible for Arnold's rape.

Generally, the Due Process Clause does not impose an affirmative duty upon the state to protect citizens from the acts of private individuals. *See DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198-200 (1989). However, an exception to the rule exists where "the state acts to *create* or *enhance* a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process." *Sanford v. Stiles*, 456 F.3d 298, 304 (3d Cir. 2006) (emphasis in original) (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1205 (3d Cir. 1996)). To prevail on a "state-created danger" theory, Arnold must prove the following four elements:

1) the harm ultimately caused was foreseeable and fairly direct;

2) a state actor acted with a degree of culpability that shocks the conscience;

3) there existed some relationship between the state and the plaintiff; and

6

> 4) a state actor affirmatively used his or her authority in a way that created a danger to the plaintiff or that rendered him more vulnerable to danger than had the state not acted at all.

*Kneipp*, 95 F.3d at 1208 (quoting *Mark v. Borough of Hatboro*, 51 F.3d 1137, 1152 (3d Cir. 1995)). In evaluating these elements, the Third Circuit's decision in *Kneipp v. Tedder* is particularly instructive.

In *Kneipp*, the plaintiff was visibly intoxicated, smelled of urine, and stumbled as she made her way home with her husband on a winter evening. 95 F.3d at 1201. When the couple was less than a block from their home, police officers stopped them for causing a disturbance on the highway. *Id.* As the officers questioned the pair, the plaintiff's husband asked if he could continue home to relieve the babysitter. *Id.* at 1202. He was permitted to leave while the officers continued to speak with the plaintiff. *Id.* Thereafter, in spite of the freezing temperatures and the plaintiff's plainly intoxicated condition, the officers sent her home alone; she was later found unconscious at the bottom of an embankment across the street from her apartment. *Id.* at 1203. The plaintiff suffered severe hypothermia resulting in, *inter alia*, brain damage, blindness, incontinence, and an inability to walk or sit upright. *Id.* at n.16.

On appeal, the Third Circuit reversed the district court's decision to grant summary judgment in favor of the defendants. In examining the elements of a state-created danger claim, the court held that the plaintiff's injuries were foreseeable because the officers were aware of her intoxication but nevertheless sent her home alone in freezing weather. *Id.* at 1208-09. For that same reason, the court held that there was a material issue of fact regarding whether, having knowledge of her impairment, the officers willfully disregarded her safety. *Id.* Finally, the Court held that "but for the intervention of the police," it was conceivable that the plaintiff would have returned home unscathed, escorted by her husband. *Id.* at 1209.

7

The case at hand is remarkably similar. As in *Kneipp*, there is no dispute that Officers Guinan and Enggasser were aware of Arnold's intoxicated state. She was belligerent, screaming, using profanity, and threw a shoe at the police vehicle; Officers Enggasser and Guinan even issued Arnold a citation for public intoxication. JA 144, 209, 623-25. Officers Guinan and Enggasser also acknowledged in their depositions that impairment from alcohol could render someone vulnerable to crime or injury, and Philadelphia Police Directives specify that intoxicated individuals in police custody should not be released until a family member arrives to escort them home or until they have regained their full faculties.[3] JA 147-49, 226.

To demonstrate that she was a foreseeable victim, Arnold need only establish that the defendants had "awareness of a *risk* of violence or harm," not that the officers foresaw the specific circumstances of her rape. *L.R. v. School Dist. of Philadelphia*, 60 F.Supp.3d 584, 590 (E.D.Pa. 2014) (emphasis in original). In addition to the officers' knowledge of her intoxicated state and the relevant Police Directives, Arnold has presented sufficient evidence of the dangerousness of the 24th police district through the deposition testimony of Sergeants Corson and Ali, who testified that the 24th police district is considered a "high-crime" area. JA 305, 361. Even if Arnold had not presented this specific evidence, "the inherent danger facing a woman left alone at night in an unsafe area," especially if she is impaired by alcohol, "is a matter of common sense." *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989); *see also Phillips v. Cty. of Allegheny*, 515 F.3d 224, 237 (3d Cir. 2008) (noting that in *Kneipp*, "ordinary common sense and experience . . . sufficiently informed the officer of the foreseeability of harm to the woman").

---

[3] Even if the Court were to accept as true Officer Enggasser's contention that Arnold declined to use a pay phone within the police station, "a telephone [is not] much help to a person who allegedly has no money to place a call." *Wood v. Ostrander*, 879 F.2d 583, 590 (9th Cir. 1989); JA 205.

Thus, the harm that could befall Arnold if left to wander alone at night, while impaired, was undoubtedly foreseeable.

As to the third prong of the state-created danger doctrine, the circumstances of Arnold's arrest, transportation, and release "distinguished her from the public at large" such that defendants would have had specific knowledge that Arnold faced a particular danger created by their actions. *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 912-13 (3d Cir. 1997); *Wood*, 879 F.2d at 590.  In *Wood*, the defendant police officer arrested a drunk driver and impounded his car, leaving the driver's female passenger stranded alone, at night, in a crime-ridden area.  As in the case at hand, the plaintiff subsequently was raped.  The Ninth Circuit held: "[t]he fact that [Officer] Ostrander arrested . . . [the driver of the vehicle], impounded his car, and apparently stranded . . . [the plaintiff] in a high-crime area at 2:30 a.m. distinguished Wood from the general public and triggers a duty of the police to afford her some measure of peace and safety." *Id.* Similarly, when defendants placed Arnold under arrest, took her into custody, and released her alone in a high crime area in the middle of the night, they created a relationship that triggered a duty to afford Arnold a measure of safety that, at the very least, should have included following police directives regarding intoxicated persons.

Arnold's arrest and removal from the scene also represented an affirmative act under state authority, the fourth prong of the state-created danger doctrine, creating an opportunity for the rape to occur that would not have existed absent the officers' intervention.  Defendants claim in their papers that, if anything, their affirmative act was that "the officers intervened – during [Arnold's] assault" and "stopped that assault and moved her somewhere else." Mtn. at 19.[4]  This argument is unsubstantiated and disingenuous in light of Defendants' Statement of Undisputed

---

[4] Defendants did not utilize page numbers in their motion; therefore, the Court uses the page numbers as designated by the ECF filing for reference.

Material Facts and the officers' testimony that Arnold was alone in the street when they arrived. Def. Facts ¶ 9 ("[a]*fter* plaintiff was beaten . . . Police arrived on the scene"); JA 135, 205.

While, as Defendants further argue, Arnold's position prior to the officers' intervention – locked outside of her apartment while intoxicated – was less than ideal, Mtn. at 18-20, Officers Enggasser and Guinan worsened Arnold's situation by removing her from the curtilage of her home, taking her away from the familiarity of her neighborhood, neglecting to arrange for medical attention, and stranding her over a mile away from her home. Undoubtedly, as in *Wood*, this represented an affirmative use of authority that rendered Arnold *more* vulnerable to danger than had the officers not acted at all. *See also Bowers v. DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) ("[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit").

Finally, the Court examines whether Defendants' conduct shocks the conscience. The severity of conduct needed to shock the conscience "will depend upon the circumstances of each case, particularly the extent to which deliberation is possible." *Sanford*, 456 F.3d at 310. The level of culpability required to shock the conscience will decrease as the time the state actors have to deliberate on their decision increases. *Id.* at 306; c*f. Miller v. City of Philadelphia*, 714 F.3d 368, 375 (3d Cir. 1999) ("[a] much higher fault standard is proper when a government official is acting instantaneously and making pressured decisions without the ability to fully consider their risks"). In cases where the action was taken following deliberation, as is alleged here, conscience-shocking behavior may be established if the defendants' actions demonstrated deliberate indifference, "or perhaps gross negligence or recklessness," to the plaintiff's safety. *Sanford*, 456 F.3d at 306, 310. Deliberate indifference requires "conscious[ ] disregard[] of a

10

substantial risk of serious harm." *Robinson v. Peirce*, 586 F. App'x 831 (3d Cir. 2014) (internal

quotations omitted) (citing *Ziccardi v. City of Philadelphia*, 288 F.3d 57, 66 (3d Cir. 2002)).

Regardless of the standard applied, "[m]ere negligence is not enough to shock the conscience."

*Sanford*, 456 F.3d at 311.

When Officers Guinan and Enggasser placed Arnold under arrest, she was visibly

bleeding from her face and obviously intoxicated, yet defendants sought no medical attention for

her once she was in custody, in violation of police directives. JA 145, 220-21, 357-58. The

officers admitted in their depositions that they failed to follow directives mandating that all adult

females charged with intoxication be transported to the Police Detention Unit ("PDU"), and that

all prisoners in the PDU with injuries must receive medical treatment. JA 145, 233-35.

Additionally, Police Directive #128 mandates that an intoxicated person may be released from

custody only where a sober third party is available to escort her home, or if the individual has

regained full control of her faculties. JA 629-30. When Arnold was released, she was still

intoxicated, she was missing at least one shoe, and her purse, wallet, keys, and cell phone had

been stolen. "An official's conduct may create state-created danger liability if it exhibits a level

of gross negligence or arbitrariness that shocks the conscience." *Estate of Smith v. Marasco*,

318 F.3d 497, 609 (3d Cir. 2003). Based upon this record, this Court finds that Arnold has

presented sufficient evidence such that a reasonable jury could find that defendants' actions

shock the conscience. Arnold having proven all four elements of a state-created danger claim,

the Court now turns to whether defendants are entitled to qualified immunity.

### 2.      *Qualified Immunity*

Qualified immunity shields government officials from civil damages liability unless the

official: (1) violated a statutory or constitutional right; and, (2) the right was clearly established

at the time of the challenged conduct. *See e.g.*, *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012); *Taylor v. Barkes*, 135 S.Ct. 2042 (2015). District courts have discretion as to the order in which to address the two-part test. *See Egolf v. Witmer*, 526 F.3d 104, 110 (3d Cir. 2008); *Ashcroft v. al-Kidd,* 563 U.S. 731, 731 (2011). Having concluded *supra* that Arnold has presented sufficient factual evidence of the deprivation of her constitutional right under the state-created danger doctrine, the Court proceeds to the second step of qualified immunity: whether the constitutional right was clearly established at the time the violation occurred.

The principle underlying the second step of the analysis is notice. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002). For a right to be "clearly established," it must be sufficiently clear such that "every reasonable official would have understood that what he is doing violates that right." *Reichle,* 132 S.Ct. at 2093. There need not be precedent directly on point for an official to lose the protection of qualified immunity; rather, "in light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Acierno v. Cloutier*, 40 F.3d 597, 620 (3d Cir. 1994).

The Supreme Court first addressed an individual's liberty interest in bodily integrity and the state-created danger doctrine in *Deshaney v. Winnebago Cty. Department of Social Services, et al.*, 489 U.S. 189 (1989). In the twenty-six years since *Deshaney*, the contours of that right have been thoroughly explored and defined. *See e.g.*, *Bright v. Westmoreland Cty.*, 443 F.3d 276, 281 (3d Cir. 2006); *Kneipp*, 95 F.3d at 1199; *Sanford*, 456 F.3d at 304. Certainly, "[i]t has been clearly established in this Circuit for nearly two decades that a state-created danger violates due process." *Estate of Lagano v. Bergen Cty. Prosecutor's Office*, 769 F.3d 850, 859 (3d Cir. 2014). Moreover, the Third Circuit has specifically addressed the state-created danger doctrine under circumstances in which police officers abandon an intoxicated woman alone in a

12

dangerous setting, through its holding in *Kneipp*. The compelling similarity of the facts of this
case to *Kneipp* in the Third Circuit, and *Wood* in the Ninth Circuit, discussed *supra* at Part
III(A)(1), lead this Court to conclude that Arnold's constitutional right was sufficiently clear
such that "every reasonable official would have understood that what he [was] doing violates that
right." *Reichle*, 132 S.Ct. at 2093; *see also Estate of Lagano*, 769 F.3d at 859 ("earlier cases
involving fundamentally similar facts can provide especially strong support for a conclusion that
the law is clearly established"). Accordingly, defendants are not entitled to qualified immunity.

**B.     Intentional Infliction of Emotional Distress**

Defendants refer to their arguments regarding state-created danger and qualified
immunity in arguing for summary judgment on Arnold's IIED claim. Mtn. at 29-30. The
Pennsylvania Supreme Court has never explicitly recognized the tort of IIED under Pennsylvania
law. *See e.g.*, *Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176 (2000) ("we have never expressly
recognized a cause of action for intentional infliction of emotional distress"). The Third Circuit,
however, has predicted that the Supreme Court of Pennsylvania would adopt the IIED tort as set
forth in Section 46 of the Restatement (Second) of Torts. *See Williams v. Guzzardi*, 875 F.2d 46,
50-51 (3d Cir. 1989) (discussing *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265, 1273 (3d
Cir. 1979)). To survive summary judgment, a plaintiff must demonstrate that: (1) the
defendant's conduct was "extreme and outrageous;" (2) the defendant acted intentionally or
recklessly; and (3) the act caused severe emotional distress. *Williams*, 875 F.2d at 52. In
Pennsylvania, a plaintiff must also support her claim with competent medical evidence that the
plaintiff actually suffered the claimed distress. *See Kazatsky v. King David Mem'l Park, Inc.*,
515 Pa. 183 (1987).

13

With regard to the first element, the defendant's conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Kasper v. Cnty. of Bucks,* 514 F.App'x 210, 217 (3d Cir. 2013) (internal citations and quotations omitted). In Pennsylvania, this action has been found to lie in only a limited number of cases. *See e.g., Chuy,* 595 F.2d at 1265 (reckless diagnosis of a fatal disease); *Papieves v. Lawrence,* 437 Pa. 373 (1970) (mishandling of a child's corpse); *Hoffman v. Memorial Osteopathic Hospital,* 342 Pa. Super. 375, 492 A.2d 1382 (1985) (denial of medical treatment in emergency room); *cf. Kutner v. Eastern Airlines, Inc.*, 514 F.Supp. 553 (1981) (no cause of action against airline for rerouting flight due to weather conditions); *Daughen v. Fox,* 372 Pa. Super. 405 (1988) (no cause of action against veterinarian for confusing x-rays causing death of dog).

The determination of outrageous conduct is within the "sound discretion of the fact-finder." *SHV Coal v. Continental Grain Co.*, 526 Pa. 489, 495-96 (1991). Reading the facts in the light most favorable to Arnold, and for the reasons discussed *supra* at Part III(A)(1), a reasonable jury could conclude that defendants recklessly acted in an extreme and outrageous manner by stranding her under such circumstances, knowing that severe emotional distress was substantially certain to occur given her intoxication alone at night, and the evidence suggests that Arnold did in fact suffer severe emotional distress when she was raped. Therefore, summary judgment shall be denied on this Count.

### C.     *Monell*

Generally, a municipal entity "cannot be held responsible for the acts of its employees under a theory of *respondeat superior* or vicarious liability." *Natale v. Camden Cnty. Corr. Facility,* 318 F.3d 575, 583 (3d Cir. 2003) (citing *Monell v. N.Y.C. Dep't. of Soc. Servs.,* 436

14

U.S. 658, 691 (1978)).  To establish municipal liability, a plaintiff must demonstrate that the municipality has a "policy or custom [that] caused the constitutional violation they allege." *Id.*  The acts of a government employee may trigger *Monell* liability where "the need to take some action to control the agents of the government is so obvious and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately indifferent to the need."  *Natale,* 318 F.3d at 584 (internal citations omitted).  Deliberate indifference requires that the plaintiff show: (1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights.  *See Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999).

Arnold alleges that the City was on notice of the alleged constitutional violation when "they signed off" on her arrest, that the failure to investigate her subsequent rape was intended to cover up Defendants' actions, and that it can be reasonably inferred that policymakers were deliberately indifferent because they failed to discipline or train the officers after Arnold was raped.  Opp'n at 23-29.  This contention suffers from a number of deficiencies, not the least of which is that it fails to address the three prongs of the deliberate indifference test.

First, Arnold has not articulated a policy or custom that led to the violation of her constitutional rights, making only vague assertions about the Philadelphia Police Department's "historical lack of policies and training" and culture.  Opp'n at 23.  Arnold cites nothing from the record to support these conclusions.  Arnold also has not presented evidence that any individual municipal policymaker or decision maker had knowledge of the alleged policy or custom she endured.  *See Santiago v. Warminster Township,* 629 F.3d 121, 135 at n.11 (3d Cir. 2010)

15

(noting a plaintiff's "obligation to plead in some fashion that [a natural person] had final policymaking authority, as that is a key element of a *Monell* claim"). Arnold's claim that "the City" was on notice of the constitutional violation when "they" signed off on documents relating to the arrest, implies a contemporaneous collusion of unidentified policymakers with the police that is simply unsupported by the record. Opp'n at 25.

As to the second prong of deliberate indifference, Arnold cites no evidence that police officers in general had a history of mishandling similar situations. Ordinarily, a plaintiff must show a pattern of similar constitutional violations to establish deliberate indifference on the part of the municipality. *Thomas v. Cumberland Cty.*, 749 F.3d 217, 223 (3d Cir. 2014) (citing *Connick v. Thompson*, 563 U.S. 51, 62 (2011)). Arnold has not identified a single situation in which another individual similarly suffered as a result of the City's alleged custom. Opp'n at 23.

By any view, the officers acted in complete contradiction to their training and police department policy as found in the record. Defendants' supervisors testified at their depositions that releasing an intoxicated detainee alone is improper procedure, and that an impaired individual is supposed to be released to a family member who can escort them home, held until they regain control of their faculties, or taken to a hospital. JA 305, 357. Officers Enggasser and Guinan admitted that they failed to follow proper procedures regarding Arnold's arrest. JA 145-46, 233-34. Although Arnold alleges that there was never an investigation into the officers' procedural violations, she cites no record evidence to support that contention. Opp'n at 25. In his deposition, Sergeant Corson even remarked that the entire incident was shocking and speculated that a formal review would likely occur. JA 306.

Arnold also takes great pains to detail what she believes was an inadequate investigation of her rape by the Police Department, arguing that the investigation was both a constitutional

16

violation in itself as well as proof that the City violated her constitutional rights through

Defendants' conduct. Opp'n at 27. The Court is mindful of Arnold's reaction to the result of the

investigation, however, "individual citizens do not have a constitutional right to the prosecution

of alleged criminals." *Capogrosso v. The Supreme Court of New Jersey*, 588 F.3d 180, 184 (3d

Cir. 2009) (citing *Sattler v. Johnson,* 857 F.2d 224, 227 (4th Cir. 1988)); *see also Leeke v.*

*Timmerman*, 454 U.S. 83, 85-86 (1981) ("[a] private citizen lacks a judicially cognizable interest

in the prosecution or nonprosecution of another"). While ultimately fruitless, Arnold's case was

not ignored; an officer from the Special Victims Unit met Arnold in the hospital and ensured that

a sexual assault kit was completed. The DNA recovered was then checked against a police

database for potential matches, but there were none. JA 405-08. Arnold asks this Court to make

an inference between her alleged treatment at the hands of the officers, the City's supposed

knowledge thereof, and the outcome of the rape investigation, but cites no record evidence to

support her contention. Moreover, Arnold has not connected the Police Department's failure to

locate and arrest her rapist *after* the fact with a municipal policy that enabled Defendants'

conduct *prior* to her rape.

  Thus, Arnold has not shown that the City was deliberately indifferent to her constitutional

rights, and summary judgment will be granted in the City's favor.

  **D.**  **Negligence**

  Defendants assert that Arnold's negligence claim is barred by the Political Subdivision

Tort Claims Act ("the Act"), which affords local government agencies immunity from tort claims

unless their actions fall within one of eight, narrowly drawn, exceptions. Mtn. at 28. These

enumerated torts involve: vehicle liability; care, custody, or control of personal property; real

property; trees, traffic controls, or street lighting; utility service facilities; streets; sidewalk; and

17

care, custody or control of animals.  42 Pa. C.S.A. § 8542.  Exceptions to governmental immunity are to be strictly construed.  *See Finn v. City of Philadelphia*, 541 Pa. 596, 601 (1995).

Here, the Court can discern no relationship between Arnold's claims and the enumerated exceptions, and Arnold offers none in her response in opposition.  Even if Defendants' actions fell within one of the eight categories, government negligence which merely facilitates injury by a third party is not actionable.  *See Grieff v. Reisinger*, 548 Pa. 13, 16 (1997) ("the government is not liable for harm caused by third parties"); *see also Edison Learning, Inc. v. School Dist. of Philadelphia*, 56 F.Supp.3d 674, 682 (E.D.Pa. 2014) ("the exception does not apply when the alleged defect merely facilitates an injury by a third party") (internal citation omitted).  Arnold did not address negligence at all in her opposition, and the Court has found nothing in the record to support a negligence claim that would fall within one of the exceptions.  In Arnold's proposed Order, she consents to dismissal of her negligence claim.  Accordingly, summary judgment is granted in favor of defendants on this Count.

BY THE COURT:

**WENDY BEETLESTONE, J.**

18